1  KILPATRICK TOWNSEND & STOCKTON LLP
   GREGORY S. GILCHRIST (State Bar No. 111536)
2  GIA L. CINCONE (State Bar No. 141668)
   Two Embarcadero Center, Suite 1900
3  San Francisco, California 94111
   Telephone: (415) 576-0200
4  Facsimile: (415) 576-0300
   E-Mail:  ggilchrist@kilpatricktownsend.com
5           gcincone@kilpatricktownsend.com

6  Attorneys for Applicant
   LEVI STRAUSS & CO.
7

FILED

JUL 27 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8              UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                    CV 18  80 123 MISC

   In re Ex Parte Application of              Case No.
11
                                             **EX PARTE APPLICATION OF LEVI
12 LEVI STRAUSS & CO.,                        STRAUSS & CO. FOR AN ORDER
                                             PURSUANT TO 28 U.S.C. § 1782 GRANTING
13              Applicant.                    LEAVE TO OBTAIN DISCOVERY FOR USE
                                             IN FOREIGN PROCEEDINGS;
14                                            SUPPORTING MEMORANDUM

15

16         Levi Strauss & Co. ("LS&Co.") hereby applies to the Court for an order authorizing discovery

17 pursuant to 28 U.S.C. § 1782. This application is filed *ex parte*, pursuant to the usual practice of this

18 Court. *See IPCom GMBH & Co. KG v. Apple Inc.,* 61 F. Supp. 3d 919, 922 (N.D. Cal. 2014) ("It is

19 common for parties to file ex parte applications [under § 1782], as 'parties will be given adequate

20 notice of any discovery taken pursuant to the request and will then have the opportunity to move to

21 quash the discovery or to participate in it.'").

22         LS&Co. seeks limited discovery from the Internet Archive, located in San Francisco,

23 California, in connection with two trademark infringement proceedings pending in the courts of

24 Belgium. The Belgian courts have found that the German company New Yorker S.H.K. GmbH

25 ("New Yorker")[1] has sold jeans that infringed LS&Co.'s valuable Arcuate Stitching Design

26
   _____
27 [1] New Yorker runs a chain of department stores throughout Belgium and Germany, and in other parts of Western Europe
   as well. New Yorker's website indicates that it has approximately 1,000 retail stores, and jeans appear to be featured in all
28 of them.

Ex Parte Application – Case No.                                          - 1 -

1  Trademark and violated a prior settlement agreement between the parties, and has assessed a per-unit

2  amount of damages. Disputes have arisen which call into question New Yorker's credibility,

3  regarding the quantity of products and the number of styles that bore the infringing designs. LS&Co.

4  is informed and believes that New Yorker may have opted out of display of its website – which could

5  show the infringing styles going back in time – on the Internet Archive's Wayback Machine.

6  Discovery of this possibility, or of any non-public snapshots of past New Yorker websites that the

7  Internet Archive has in its database, is all that LS&Co. seeks from the Internet Archive. For the

8  reasons outlined below, LS&Co. asks that the Court grant its request.

9  ## I.    FACTUAL BACKGROUND

10  ### A.    The Proceedings in Belgium

11  LS&Co. marks its LEVI'S® brand products with a set of trademarks that are famous around

12  the world. LS&Co. has spent great amounts of time, money, and effort over many years advertising

13  and promoting the products on which its trademarks are used, and has sold many millions of these

14  products all over the world. Through these investments and large sales, LS&Co. has created

15  considerable goodwill and a reputation for quality products.

16  Among LS&Co.'s most iconic trademarks is the Arcuate Stitching Design Trademark (the

17  "Arcuate trademark"), which consists of a distinctive pocket stitching design that is the oldest known

18  apparel trademark in the United States still in continuous use. LS&Co. has used the Arcuate

19  trademark continuously since 1873 on clothing products, and affixes the Arcuate trademark to almost

20  every pair of LEVI'S® jeans it sells. As a result, consumers all over the world recognize the Arcuate

21  trademark and associate it with LEVI'S® jeans – the "original" blue jeans. In particular, LS&Co. has

22  sold LEVI'S® jeans and other products bearing the Arcuate trademark in Belgium and Germany

23  continuously since the 1960's, and has owned registrations for the mark in Germany since 1960 and in

24  Belgium since 1967.

25  Because the Arcuate trademark is so important to LS&Co.'s branding efforts and to the

26  identity of its LEVI'S® jeans, LS&Co. devotes significant resources to the enforcement of its rights in

27  the trademark. Its enforcement efforts include cease and desist letters, trademark oppositions, and

28  where necessary, litigation. Relevant to this application, LS&Co. undertook such an enforcement

1  action in the mid-2000's against the German retail chain New Yorker, owned by the German company
2  New Yorker S.H.K. GmbH. New Yorker was using several pocket stitching designs on its jeans that
3  LS&Co. believed violated its rights in the Arcuate trademark. The parties eventually reached a
4  settlement agreement, dated July 21, 2006, under which New Yorker agreed not to use any stitching
5  design that was similar to the Arcuate trademark. New Yorker further agreed that if it sold any
6  garment in violation of the agreement after January 1, 2007, it would be subject to a contractual
7  penalty of 50 euros per garment. Any action for violation of the agreement was required to be brought
8  in the courts of Brussels, Belgium. A copy of the 2006 settlement agreement is attached as Exhibit A.

9      LS&Co. subsequently discovered that New Yorker was using five different pocket stitching
10  designs that violated the 2006 settlement agreement as well as LS&Co.'s trademark rights. Pursuant
11  to the terms of the agreement, LS&Co. filed a complaint against New Yorker in Brussels in October
12  2010, seeking damages in the amount of 1,250,000 euros (based on an estimate of a minimum of
13  5,000 units sold of each infringing style, times five styles, times 50 euros per unit). Given that New
14  Yorker's website indicates that it has over 1,000 retail stores, LS&Co. believed its estimate of
15  damages was, if anything, conservative. A copy of LS&Co.'s 2010 complaint is attached as Exhibit
16  B.

17      New Yorker never contested the amount of damages claimed by LS&Co. The Brussels court
18  found that New Yorker had indeed violated the 2006 agreement, and entered a provisional judgment in
19  the amount of 1,250,000 euros in LS&Co.'s favor. For the reasons discussed below, LS&Co. has
20  recently come to the conclusion that its estimate of 25,000 infringing units was indeed likely too low,
21  and accordingly has requested that the Brussels court reopen the 2010 litigation.

22      In the meantime, LS&Co. filed a second lawsuit against New Yorker in Brussels in 2014 over
23  yet another infringing stitching design that violated the 2006 agreement, a design which is referred to
24  as the "Smog" design. A copy of LS&Co.'s 2014 complaint is attached as Exhibit C. The Brussels
25  court found that the Smog design, like New Yorker's previous designs, infringed LS&Co.'s trademark
26  rights and violated the 2006 agreement. On appeal, the Brussels Court of Appeal agreed that New
27  Yorker had breached the 2006 agreement by selling the Smog design, and also affirmed that the 50
28  euros/unit penalty clause was valid and applicable. At LS&Co.'s request, the court appointed an

Ex Parte Application – Case No.                                                                    - 3 -

1  expert (akin to a court-appointed Special Master) to determine how many units were sold in violation
2  of the agreement and were therefore subject to the 50 euros/unit contractual damages. Under Belgian
3  law, the parties may submit to the expert any information that they believe would be helpful to the
4  expert's mission.

5     In its initial submission to the expert, New Yorker claimed that it sold only one style of jeans
6  bearing the "Smog" design, and that it sold only 3,507 pairs of those jeans. LS&Co. is certain that this
7  number is false. By purchasing jeans on the secondary market, LS&Co. has determined that many
8  different styles of New Yorker jeans were sold with the infringing "Smog" design. As noted above,
9  New Yorker has approximately 1,000 retail stores located throughout Europe, which New Yorker
10  appears to stock somewhat uniformly in terms of the styles of jeans on store shelves. As a successful
11  retailer, New Yorker presumably stocks its stores with enough available styles, and a reasonable array
12  of sizes, to meet consumer demand. Given economies of scale, the number of styles with the
13  infringing "Smog" design, and the number of stores, at any reasonable production level of each style,
14  LS&Co. believes the number of infringing units is likely to run into the millions.

15     The court-appointed expert is attempting to follow up with New Yorker to obtain accurate
16  information and supporting documentation, but to date, New Yorker has resisted the expert's efforts.
17  One of New Yorker's "defenses" is that many of the infringing styles were sold prior to the 2006
18  settlement agreement, and therefore should not be included in the damages calculation. In December
19  2017, New Yorker represented that it would grant the expert access to its records, including order
20  forms showing which stitching designs were used on the various styles of its jeans at various points in
21  time. In April 2018, however, New Yorker reneged on its promise to be transparent with the expert,
22  while still assuring the expert – despite the absence of any records – that only negligible amounts of
23  infringing products were sold after 2006. The expert responded by noting that New Yorker's
24  "assurances" were not supported by any evidence, and demanding access to New Yorker's stock,
25  records, and IT systems.

26     **B.    The Internet Archive**

27     The Internet Archive, which offers a service popularly known as the "Wayback Machine"
28  (https://archive.org/), is a 501(c)(3) non-profit organization located in San Francisco. It describes its

Ex Parte Application – Case No.                                                          - 4 -

1   mission as "building a digital library of Internet sites and other cultural artifacts in digital form." The

2   Archive has preserved over 20 years of Internet history. Regarding the Wayback Machine, the

3   Archive's website explains, "Internet Archive's web archive, launched in 1996, contains over 2

4   petabytes of data compressed, or 150+ billion web captures, including content from every top-level

5   domain, 200+ million web sites, and over 40 languages." Researchers can use the Wayback Machine

6   to search for the names of publicly available websites, and include date ranges for the search.

7       Website owners can request that their websites be excluded from the Wayback Machine. In

8   order to do so, the website owner must send an email asking the Archive to review the site. The

9   Archive's website includes this information on its FAQ page:

10          **How can I have my site's pages excluded from the Wayback Machine?**

11          You can send an email request for us to review to info@archive.org with the URL (web

12          address) in the text of your message.

13

14   (https://archive.org/about/faqs.php).

15       As part of its investigation into how many New Yorker jeans with the infringing Smog design

16   were sold after January 1, 2007, LS&Co. attempted to view past versions of New Yorker's website,

17   www.newyorker.de, on the Wayback Machine. However, it appears that that website has been

18   excluded from the Wayback Machine, making it impossible to look at old screenshots of New

19   Yorker's website. When searching for www.newyorker.de, this is what the Wayback Machine shows:

20

21       newyorker.de

22

23

24       Sorry.

25       This URL has been excluded from the Wayback Machine.

26

27

28

1    Moreover, other New Yorker-related websites, such as www.newyorker.cr and

2    www.newyorker.sk, show gaps in the Wayback Machine's results for the period 2007-2016:



20    Accordingly, because it could confirm that New Yorker is trying to hide evidence of its infringements,

21    LS&Co. would like to determine from the Internet Archive's records whether New Yorker requested

22    that the www.newyorker.de website be excluded from the Wayback Machine, and/or that certain

23    periods of the history of the www.newyorker.cr and www.newyorker.sk websites be excluded. And,

24    as these may be the only preserved records of past New Yorker product offerings, LS&Co. would also

25    like to ask if the websites are available for review, even if they are hidden from public view. If so, this

26    would be important information to convey to the expert in the Smog case as well as to the court in the

27    first New Yorker case recently reopened, to fairly evaluate New Yorker's claims that dozens of styles

28    of jeans available for purchase today on the secondary market were actually first sold before 2007.

## II.     ARGUMENT

### A.     Standards Governing Requests Under Section 1782

28 U.S.C. § 1782 provides that a district court may order discovery for use in foreign proceedings if three conditions are met: "(1) the person from whom the discovery is sought resides or is found in the district of the district court to which the application is made, (2) the discovery is for use in a proceeding before a foreign tribunal, and (3) the application is made by a foreign or internal tribunal or 'any interested person.'" *In re Google Inc.*, 114 U.S.P.Q.2d 1161 (N.D. Cal. 2014).

In addition to these statutory requirements (all of which are met here), the Supreme Court has identified four discretionary factors that should be taken into account in addressing a Section 1782 request: "(1) whether the material sought is within the foreign tribunal's jurisdictional reach and thus accessible absent Section 1782 aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court jurisdictional assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoena contains unduly intrusive or burdensome requests." *Id.* (citing *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004)). This Court has held, "A district court's discretion is to be exercised in view of the twin aims of Section 1782: providing efficient assistance to participants in international litigation, and encouraging foreign countries by example to provide similar assistance to our courts." *In re Eurasian Natural Resources Corp., Ltd.*, No. 18-MC-80041-LB, 2018 WL 1557167, at *2 (N.D. Cal. Mar. 30, 2018). Moreover, "There is no requirement that the party seeking discovery establish that the information sought would be discoverable under the governing law in the foreign proceeding or that United States law would allow discovery in an analogous domestic proceeding." *Id.*

### B.     This Request Satisfies the Statutory Requirements

The Internet Archive is found within this district within the meaning of Section 1782, because it has offices in this district and conducts business here. *See, e.g., In re the Republic of Ecuador*, Case Nos. C 11–80171 CRB, C 11–80172 CRB, 2011 WL 4434816 (N.D. Cal. Sept. 23, 2011) (granting Section 1782 application regarding company that maintained an office within this district). The

1  discovery is sought for use in two ongoing proceedings before the courts of Belgium. And, this

2  application is brought by an interested person, as LS&Co. is a litigant and is seeking damages in both

3  of the Belgium proceedings. *See Intel*, 542 U.S. at 256 ("No doubt litigants are included among, and

4  may be the most common example of, the 'interested person[s]' who may invoke § 1782").

5       Accordingly, the three statutory requirements for a Section 1782 request are met here.

6       **C.    The Discretionary Factors Favor Granting LS&Co.'s Request**

7       The first discretionary factor is whether the material sought through this request is within the

8  reach of the foreign tribunal, in which case Section 1782 intervention is not required. *See In re Varian*

9  *Medical Systems International AG*, Case No. 16-MC-80048-MEJ, 2016 WL 1161568 (N.D. Cal. Mar.

10 24, 2016) (noting that the "key issue" under this factor is whether the material is obtainable through

11 the foreign proceeding) (citation omitted). Here, the Internet Archive is not a participant in the

12 Belgium proceedings. *See In re Motorola Mobility, LLC,* Case No. C 12-80243 EJD PSG, 2012 WL

13 4936609, at *2 (N.D. Cal. Oct. 17, 2012) ("discovery required from a non-party weighs in favor of

14 granting the subpoena"); *In re Apple, Inc.*, Case No. MISC 12–80013 JW, 2012 WL 1570043 (N.D.

15 Cal. May 2, 2012) (the fact that a party is a nonparticipant in the foreign proceeding weighs in favor of

16 granting Section 1782 discovery). LS&Co. would not be able to request this evidence directly through

17 the Belgian courts, nor would the Belgian courts be able to request this evidence directly from the

18 Internet Archive. Declaration of Thierry van Innis ("Van Innis Dec."), ¶ 2. Because the requested

19 evidence is not within the reach of the Belgian courts, this factor favors granting LS&Co.'s

20 application.

21      The second factor looks at the nature of the foreign tribunal, the character of the proceedings,

22 and the receptivity of the foreign tribunal to the assistance of the U.S. court. Here, there is every

23 reason to believe that the Belgian courts would be receptive to this evidence. In particular, it appears

24 the expert in the Smog case would accept the evidence, as the expert has the authority to ask any

25 questions and request any evidence from the parties that he deems relevant, and the parties are allowed

26 to submit to the expert any information that they believe would be helpful. Van Innis Dec., ¶ 3.

27 Certainly, there is no evidence or indication that the Belgian courts would not accept this evidence,

28 and "'[i]n the absence of authoritative proof that a foreign tribunal would reject evidence obtained

1 │ with the aid of section 1782,' courts tend to 'err on the side of permitting discovery.'" *Varian, supra,*
2 │ at *4 (citation omitted); *see also Eurasian, supra,* at *3 (granting Section 1782 request where "[t]here
3 │ is no information that a U.K. court would reject information obtained through Section 1782
4 │ discovery"). The second factor therefore weighs in favor of granting LS&Co.'s Section 1782 request.

5 │   The third factor asks whether LS&Co. is acting in bad faith, in an attempt to "circumvent
6 │ foreign proof-gathering restrictions" or violate some other policy of the United States or Belgium.
7 │ That is clearly not the case here. LS&Co. is not trying to circumvent any restriction – to the contrary,
8 │ as noted above, the expert in the Smog case is specifically authorized to request and accept any
9 │ evidence that might be helpful in his assessment of the damages owed by New Yorker. Moreover,
10 │ LS&Co. is attempting to combat the bad faith of New Yorker, which has not been forthcoming in its
11 │ dealings with the expert. Even if Belgian law does not give the Belgian courts easy access to
12 │ documents in the possession of the Internet Archive, there is no policy of Belgium or of the United
13 │ States that would counsel against granting this request. Van Innis Dec., ¶ 4. Accordingly this factor
14 │ also weighs in favor of granting LS&Co.'s requested discovery. *See Motorola, supra,* at *2 (this
15 │ factor weighs in favor of the discovery request where "there is no indication in the record of an
16 │ attempt to subvert a foreign tribunal's restrictions").

17 │   The fourth factor, whether the request is unduly intrusive or burdensome, clearly favors
18 │ granting this request. The request is very narrow and specific – namely, whether Internet Archive has
19 │ had any communication with New Yorker S.H.K. GmbH concerning archiving of the
20 │ www.newyorker.de, www.newyorker.cr, and/or www.newyorker.sk websites, and whether it
21 │ maintains any non-public snapshots of the New Yorker websites. These two categories of requests
22 │ can be easily satisfied by a simple search of the Internet Archive's records. In similar circumstances,
23 │ this Court has held that the fourth factor weighs in favor of granting Section 1782 discovery. *See, e.g.,*
24 │ *Motorola, supra,* at *3 (granting request for "five categories of information . . . narrowly tailored to
25 │ the allegations" in the foreign proceeding); *In re American Petroleum Institute,* Case No. C 11-80008
26 │ JF PSG, 2011 WL 10621207, at *3 (N.D. Cal. Apr. 7, 2011) (granting request for "six categories of
27 │ documents, that on their face, do not appear to be unduly intrusive or burdensome and appear to be
28 │ related to the claims" in the foreign proceeding).

### III.    CONCLUSION

LS&Co.'s request pursuant to 28 U.S.C. § 1782 for discovery in aid of a foreign proceeding satisfies all of the statutory requirements, and all of the discretionary factors set out by the U.S. Supreme Court weigh in favor of granting the request. Accordingly, LS&Co. asks that this Court grant the request and issue the proposed order filed with this application.

Dated: July 27, 2018

Respectfully submitted,

KILPATRICK TOWNSEND & STOCKTON LLP

By: _____
        GIA L. CINCONE

Attorneys for Applicant
LEVI STRAUSS & CO.

EXHIBIT A

## SETTLEMENT AGREEMENT

BETWEEN

LEVI STRAUSS & Co., having its headquarters in SAN FRANCISCO, CALIFORNIA 94120, Levi's Plaza, 1155 Battery Street (hereafter LEVI STRAUSS & Co.),

Represented by Sandrine Besnard-Corblet, Chief European Counsel

AND

New Yorker S.H.K. Jeans GmbH, having its headquarters in  Hansestraße 48, 38112 Braunschweig (hereafter NEW YORKER),

Represented by ................................................................................................
.....................................KNOKE  SALLAWITZ  v.  BISMARCK...........................
BRAUER  v. BOCK  WENDENBURG
RECHTSANWÄLTE  WIRTSCHAFTSPRÜFER  STEUERBERATER  NOTARE
RECITALS          LÜERSTRASSE 10 -12   30175 HANNOVER
TELEFON 05 11 - 85 40 40   FAX 05 11 - 81 58 74

Whereas LEVI STRAUSS & CO., well-known distributor and manufacturer of clothing products, is the owner of the following trade marks which it has been using for a long time to distinguish clothing products, amongst others jeans:

the Community trademark number 65 342 of 1 April 1996,



the Community trademark number 2 285 443 of 4 July 2001,



the Community trademark number 2 298 933 of 12 July 2001,



the German trademark number 909 346 of 3 July 1970,



the Community trademark number 2 292 373,



the Community trademark number 65 318 and



the Community trademark number 112 862.



LEVI STRAUSS & Co. widely uses those trade marks, which have acquired considerable notoriety throughout the world.

NEW YORKER uses in several countries (amongst others in Germany), for clothing products and in particular pants under the trade marks Amisu, Fishbone or Smog graphical signs which are very similar to the graphical trade marks of LEVI STRAUSS & Co. referred to above namely stitching and other designs such as depicted below and in Exhibit 1 (hereinafter: the Litigious Signs):

  

LEVI STRAUSS & Co. opposes the use of those signs and NEW YORKER is ready to cease using them.

The parties have agreed on the terms and conditions of an amicable resolution of their dispute as set out below.

Now, therefore the parties agree as follows for the territory of the European Economic Area, Switzerland, the Russian Federation and Croatia (hereafter "Europe"):

Article 1

NEW YORKER hereby acknowledges that it is aware of the above-mentioned trade marks of LEVI STRAUSS & Co. NEW YORKER acknowledges their validity and their fame, as well as LEVI STRAUSS & Co.'s ownership of all corresponding trade marks throughout Europe.

Article 2

2.1. Without prejudice to the provisions under article 4, the parties agree that NEW YORKER will cease throughout Europe, as of the date of this agreement, to manufacture, advertise, promote, market, sell or offer to sell either directly or indirectly clothing products, amongst others jeans, pants and shorts, with the Litigious Signs or any other sign which is similar or identical to one or more of the above-mentioned trade marks, under the Amisu, Fishbone or Smog brand names or any other brand name.

2.2. It is explicitly agreed that by way of example the following will in any case be considered as the use of a sign identical/similar sign to the Tab or the Arcuate trade mark:

2.2.1. As far as the Arcuate trade mark is concerned:

   i.    a stitching design which is a slavish copy of the double Arcuate stitching design of LEVI STRAUSS & Co. (identical and quasi-identical), such as depicted in Exhibit 2 by way of example,

   ii.   a stitching design consisting of one or more curved lines meeting in the middle of the pocket and pointing downwards, such as depicted in Exhibit 3, by way of example.

   iii.  a stitching design which is a slavish copy of the double Arcuate stitching design of LEVI STRAUSS & Co. (identical and quasi-identical), but inverted, such as depicted in Exhibit 4, by way of example.

2.2.2. As far as the Tab trade mark is concerned:

   –   a rectangular figure contrasting along the vertical edges of a pocket irrespective of its physical expression, its fixation mode, its exact location (protruding from the left or the right of the edge), its colour or the inscriptions it is carrying.

### Article 3

NEW YORKER agrees that within 30 days of the date of signature of this agreement, it will notify its subsidiaries, affiliates, product licensees or product franchisees throughout Europe of the existence and principles of this agreement and of their obligation to comply with all the provisions of it.

### Article 4

By way of exception to article 2, LEVI STRAUSS & Co. agrees that existing stocks of products bearing the Litigious Signs, estimated at 74.000 units, can be sold throughout Europe by NEW YORKER until 31 December 2006.

In the event, after expiration of this date, NEW YORKER, its subsidiaries, affiliates or its product licensees are in the possession of products bearing the Litigious Signs, NEW YORKER will destroy the clothing products or remove the Litigious Signs from the products prior to their further distribution.

### Article 5

NEW YORKER acknowledges that the LEVI STRAUSS & Co. releases do not apply to any matter not specifically released by this agreement. In particular and without limiting the generality of the foregoing, the parties acknowledge that LEVI STRAUSS &Co.'s release does not apply to (a) any future use by NEW YORKER of any tab, label, or pocket design that infringes LEVI STRAUSS & Co.'s rights, or (b) any past use by NEW YORKER of any tab, label, or pocket design except the Litigious Signs, regardless of whether such design was first used prior to the date of this Agreement.

### Article 6

As of the date of 1 January 2007, NEW YORKER will be liable to pay € 50 per infringing garment used in commerce in breach of this agreement, in particular

manufactured, advertised, promoted, marketed, sold, offered for sale or possessed for such purpose, be it directly or indirectly.

Article 7

Without prejudice to the provisions under articles 9 and 10, LEVI STRAUSS & Co. is waiving for the territory of Europe all claims for monetary relief or damages from the past use of the Litigious Signs identified above as long as all of the other terms and conditions of this Agreement are honoured by NEW YORKER.

Article 8

This Agreement and any dispute which may arise concerning enforcement or interpretation of this Agreement shall be governed by the laws of Belgium.  In such case the Courts of Brussels will be exclusively competent.

Article 9

NEW YORKER agrees to pay a lump-sum of € 70.000 for damages and € 10.735,50 for legal fees incurred.

Article 10

NEW YORKER agrees to pay € 6.500 as contribution to the costs of the publication of the text in Exhibit 5 in Sportswear International.

Article 11

The present agreement binds the parties and their successors-in-title.

Wherefore, LEVI STRAUSS & Co. and NEW YORKER, on their own behalf and on behalf of their respective affiliates, through their below identified authorised officers, hereby adopt and confirm all of the terms and conditions of the Settlement set out above.


LEVI STRAUSS & Co.


Name: Sandrine Besnard-Corblet

Title:   Chief European Counsel      Date:   21/7/2006 .


Für
NEW YORKER S.H.K. Jeans GmbH


Name:   Philipp M. v. Bismarck

Title:   Rechtsanwalt              Date: 21.07.2006

EXIHDIT  1



































28 17:08













- 03-266



## EXHIBIT 2



**EXHIBIT 3**



**EXHIBIT 4**



**EXHIBIT 5**

# COMMUNICATION

**A clothing manufacturer who commercialises jeans throughout Europe, has come to an agreement with**

**LEVI STRAUSS & Co.**

**and has agreed to cease the use on clothes of the following signs, which infringe the 'Arcuate' trademarks of Levi Strauss & Co.:**

 

 

*Hands off of Levi's® Trademarks !*

 

**Tab: Trademark since 1936**　　　　　**Arcuate: Trademark since 1873**

::ODMA\PCDOCS\HM\294575\1

EXHIBIT B

**Marie-Christine DE HAES – Luc VERHULST**
DE HAES-VERHULST SPRL
RPM Bruxelles BCE 0457.384.989
Huissiers de Justice

Rue des Bannières, 28 boite 3 – 1150 BRUXELLES

Tél : 02/771.72.60                                                    Fax :   02/762.04.70
Ouvert de 09.00 à 12.00h                        CCP : 000-0134767-34 – KBC : 734-0223168-77

## ASSIGNATION    Référence : A787-10

Attendu que

1.  La requérante et la citée sont toutes deux des fabricantes et distributrices de vêtements, en particulier de pantalons.

2.  La requérante utilise, depuis plus d'un siècle, une marque graphique devenue à ce jour la marque la plus ancienne dans le secteur vestimentaire.

    Cette marque graphique, dénommée "arcuate", est composée du dessin de deux lignes courbes positionnées dans le dessin d'une poche. Dans son exécution classique, ce dessin correspond à la manière stylisée dont est généralement représenté le vol d'un oiseau, raison pour laquelle elle est parfois appelée "aile de mouette".

    La marque "arcuate" a notamment fait l'objet d'un enregistrement en tant que marque communautaire pour des vêtements le 26 juillet 2004 sous le numéro 002285443, avec la représentation graphique suivante :



3.  Dans le courant de l'année 2006, la requérante constata que la citée faisait usage, pour distinguer ses pantalons, de signes similaires à sa marque "arcuate", notamment des signes suivants:

   



4.  La requérante s'opposa à ces usages et les parties mirent fin de manière amiable à ce différend par la signature d'une transaction, le 21 juillet 2006.

Aux termes de cette transaction, il fut notamment convenu que :

–  « *Les parties conviennent que NEW YORKER s'engage à cesser, dans toute l'Europe, à partir de la date de la transaction, de produire, faire de la publicité, promouvoir, commercialiser, vendre ou offrir en vente, de manière directe ou indirecte, des vêtements, en ce compris des jeans, pantalons ou shorts, <u>portant les Signes Litigieux ou tout autre signe similaire ou identique à l'une des marques de Levi Strauss</u>, sous ses marques Amisu, Fishbne, Smog ou toute autre marque* » (article 2.1 de la transaction[1], souligné par la requérante);

–  « *Il est expressément convenu que, à titre d'exemple, ce qui suit <u>sera considéré en tout hypothèse comme l'usage d'un signe identique/similaire</u> à (...) la marque Arcuate :*

*2.2.1. Concernant la marque Arcuate :*

*i. le dessin d'une surpiqûre qui est une copie servile du dessin de la double surpiqûre Arcuate de LEVI STRAUSS & Co <u>(identique ou quasi identique), dont l'annexe 2 contient quelques exemples</u> ;*

*ii. le dessin d'une surpiqûre consistant <u>en une ou plusieurs lignes courbes se rejoignant au milieu d'une poche et pointant vers le bas, dont l'annexe 3 contient quelques exemples</u> ; (...)* » (article 2.2 de la transaction[2], souligné par la requérante);

---

[1] Traduction libre de "*the parties agree that NEW YORKER will cease throughout Europe, as of the date of this agreement, to manufacture, advertise, promote, market, sell or offer to sell either directly or indirectly clothing products, amongst other jeans, pants and shorts, with the Litigious Signs or any other sign which is similar or identical to one of the above-mentioned trade marks, under the Amisu, Fishbone or Smog brand names or any other brand name.*"

[2] Traduction libre de "*It is explicitly agreed that by way of example the following will in any case be considered as the use of a sign identical/similar sign to (...) the Arcuate trade mark :*

*2.2.1. As far as the Arcuate trade mark is concerned :*

*i. a stitching design which is a slavish copy of the double Arcuate stitching design of LEVI STRAUSS & Co. (identical and quasi-identical), such as depicted in Exhibit 2 by way of example,*

*ii. a stitching design consisting of one or more curved lives meeting in the middle of the pocket and pointing downwards, such as depicted in Exhibit 3, by way of example; (...)* "

Ainsi l'annexe 2 présente, entre autres, les signes suivants qui constituent des exemples de signes que les parties ont considéré comme identiques ou quasi-identiques :



Par ailleurs, l'annexe 3 donne, entre autres, les signes suivants qui constituent des exemples de signes que les parties ont considéré comme similaires :



Enfin, la transaction dispose également que : « *A dater du 1er janvier 2007, NEW YORKER payera 50 euros par vêtement contrefaisant qui serait utilisé à des fins commerciales en violation de cette transaction, notamment qui serait produit, pour lequel elle aurait fait de la publicité, qu'elle aurait promu, distribué, vendu, offert en vente, ou détenu à cette fin, de manière directe ou indirecte* » (article 6 de la transaction[3]).

5.    Dans le courant de l'année 2010, la requérante s'aperçut que la citée distribuait, notamment en Allemagne, des pantalons portant les signes suivants et commercialisés sous différentes marques verbales telles que "Amisu", "Ann Christine" ou "Fishbone" :



---

[3] Traduction libre de "*As of the date of 1 January 2007, NEW YORKER will be liable to pay €50 per infringing garment used in commerce in breach of this agreement, in particular manufactured, advertised, promoted, marketed, sold, offered for sale or possessed for such purpose, be it directly or indirectly.*"



Ces signes constituent manifestement des signes dont la citée s'était, par transaction, interdit de faire usage.

En effet, aucun de ces signes ne présente moins de similarité qu'un des nombreux signes donnés en exemple dans la transaction.

En distribuant ou en offrant en vente des pantalons portant ces signes, il ne peut dès lors faire aucun doute que la citée a violé ses obligations contractuelles.

6. Dans ces circonstances, il convient d'ordonner à la citée, sous peine d'astreinte, de cesser d'offrir en vente ou de distribuer des pantalons portant ces signes.

7. Il convient par ailleurs de condamner la citée à payer, à la requérante, la compensation forfaitaire qui a été convenue, à l'article 6 précité de la transaction, pour le dommage éventuellement subi par suite de l'inexécution par la citée de son obligation.

Ne disposant pas du nombre précis de pantalons litigieux, la requérante estime que la citée a dû, à tout le moins, en distribuer 5.000 par modèle, soit une quantité minimale de 25.000 pantalons litigieux.

La citée dispose en effet, rien qu'en Allemagne, de pas moins de 302 magasins et il ne peut faire aucun doute que chaque magasin distribua à tout les moins une petite vingtaine de chacun des pantalons.

Cette estimation, très conservatrice, se trouve d'ailleurs corroborée par le fait que, lors de la signature de la transaction, il fut admit que la citée disposait encore en stock d'environ 74.000 pantalons (article 4 de la transaction).

Dans ces circonstances, il convient de condamner la citée à payer à la requérante la somme provisionnelle de 1.250.000 euros (soit un nombre minimal de 25.000 pantalons multiplié par la somme forfaitaire convenue de 50 euros) et de désigner un expert chargé de déterminer le nombre de pantalons litigieux offerts en vente ou distribués en violation de la transaction.

8. Enfin, en vertu de l'article 8 de la transaction, cette dernière est soumise au droit belge et tout litige y relatif est de la compétence exclusive des tribunaux de Bruxelles.

**SI EST-IL QUE:**

L'an deux mil dix, le vingt-et-un septembre.

A la requête de :

**LEVI STRAUSS & CO société de droit américaine constituée sous les lois du Delaware**, dont le siège social est établi aux Etats-Unis de l'Amérique, à 94106 San Francisco, Californië, 1155 Battery Street, Levi's Plaza.

Ayant pour conseil Maîtres **Thierry van INNIS et Hakim HAOUIDEG**, Avocats, de résidence en Belgique, à 1040 BRUXELLES (Etterbeek), Boulevard Louis Schmidt 29.

Je soussignée, Maître Marie-Christine DE HAES, Huissier de Justice de résidence à 1150 WOLUWE-SAINT-PIERRE, Rue des Bannières, 28.

Ai donné CITATION à :

La Société de droit allemand **New Yorker S.H.K. Jeans GmbH**, dont le siège social est établi en Allemagne, à 38112 Braunschweig, Hansestrasse, 48,

*\*\*\* faisant la signification comme mentionné ci-après \*\*\**

*à comparaître le JEUDI VINGT-HUIT OCTOBRE 2010 à 09.00 heures devant la première chambre du TRIBUNAL DE COMMERCE DE BRUXELLES, Salle A, siégeant au local ordinaire de ses audiences, rue de la Régence, 4 à 1000 Bruxelles (Belgique).*

POUR:

Entendre déclarer la demande recevable et fondée;

Ordonner à la citée de cesser d'offrir en vente ou de distribuer des pantalons portant des signes qu'elle s'est, par la transaction signée le 21 juillet 2006, engagée à ne plus utiliser, sous peine d'une astreinte de 1 000 euros par pantalon offert en vente ou distribué en violation cet ordre ;

Condamner la citée au paiement à la requérante d'une somme provisionnelle de la somme provisionnelle de 1.250.000 euros ;

Avant dire droit de manière définitive sur la demande en réparation du dommage de la requérante, entendre nommer un expert ayant pour mission de déterminer le nombre de pantalons offerts en vente ou distribués en violation de ladite transaction ;

Condamner la citée à tous les dépens, en ce compris l'indemnité de procédure.

Entendre déclarer que le jugement à intervenir soit exécutoire par provision nonobstant tout recours et sans caution et avec exclusion de la possibilité de cantonnement.

Dès lors conformément à l'article 6.1. du Règlement (CE) n° 805/2004 entendre certifier le jugement à intervenir en tant que titre exécutoire européen, et entendre dire pour droit que le greffier en chef de la juridiction est tenu de délivrer, à la première demande de la partie demanderesse, le certificat de titre exécutoire européen au moyen du formulaire type figurant à l'annexe I dudit Règlement, conformément au prescrit de son article 9.1.

En outre, conformément à l'article 17 dudit Règlement, j'ai communiqué à la partie citée qu'elle peut contester la demande en comparaissant physiquement le jeudi vingt-huit octobre 2010 à 09.00 heures devant la première chambre du Tribunal de Commerce de Bruxelles, Salle A, siégeant au local ordinaire de ses audiences, rue de la Régence, 4 à 1000 Bruxelles (Belgique) et qu'elle peut comparaître physiquement devant le tribunal d'une des manières suivantes :

- par son organe (qui doit fournir la preuve de sa qualité),
- par un avocat (ce qui n'est toutefois pas obligatoire),


- qu'un avocat (donc *non* l'organe de la partie citée) peut également comparaître par écrit, sauf si la juridiction décidait de retenir la cause à l'audience d'introduction,
- que, si la partie citée ne comparaît pas, le Tribunal de Commerce de Bruxelles BELGIQUE) peut tout de même prononcer un jugement, condamnant la partie citée aux sommes et intérêts demandés dans la présente citation, y compris les frais de l'instance (un pareil jugement s'appelle un jugement par défaut), jugement qui peut être déclaré exécutoire par provision par la juridiction, ce qui signifie que le jugement peut être exécuté contre la partie citée, même si celle-ci décidait d'initier un recours contre la décision en question.


Sous toutes réserves généralement quelconques et sans aucune reconnaissance préjudiciable et notamment sous réserves expresses de majorer le montant de la demande principale en cours d'instance;

Demande fondée sur les motifs repris aux attendus qui précèdent le défaut et refus de paiement, les lois sur la matière et sur tous autres moyens à faire valoir à l'audience;

Et pour que le destinataire n'en ignore, mais attendu qu'elle est établie à la République Fédérale d'Allemagne, État membre de l'Union européenne, et attendu qu'aucune adresse ou domicile élu du destinataire ne me sont connus en Belgique, j'ai, huissier de justice susdit et soussigné,

> *en vertu des articles 4 et 15 du Règlement (CE) N° 1393/2007 du Conseil de l'Union européenne du 13/11/2007, relatif à la signification et à la notification dans les États membres des actes judiciaires et extrajudiciaires en matière civile et commerciale,*

transmis, sous pli recommandé, avec avis de réception, déposé ce jour au bureau de poste à Bruxelles,

1. deux copies du présent exploit, conformément à l'article 4 (5);
2. accompagnées d'une demande de signification d'acte (formulaire type), complété en allemand ;

à

**Amtsgericht Braunschweig**
**An der Martinikirche, 8**
**D-38100 Braunschweig**
**DEUTSCHLAND**

avec prière:

1. d'adresser, à la réception de l'acte, par les moyens les plus rapides, un accusé de réception à l'entité d'origine, à savoir l'huissier de justice instrumentant soussigné, dans les meilleurs délais et en tout cas, dans les sept jours qui suivent cette réception en utilisant le formulaire type adéquat, conformément à l'article 6 (1) du Règlement;

2. de transmettre l'acte, pour la signification duquel elle n'est pas territorialement compétente, ainsi que la demande, à l'entité requise territorialement compétente du même État membre, qui, elle, en informera l'entité d'origine au moyen du formulaire type, conformément à l'article 6 (4) du Règlement;

3. de procéder ou de faire procéder à la signification de l'acte dans les meilleurs délais et s'il n'a pas été possible de procéder à la signification dans le délai d'un mois, d'en informer l'entité d'origine, en application de l'article 7 (2), au moyen du certificat prévu à l'article 10;

4. lorsque les formalités relatives à la signification auront été accomplies, d'établir une attestation au moyen du formulaire type et de l'adresser à l'entité d'origine, avec une copie de l'acte signifié, conformément aux dispositions de l'article 10;

5. d'aviser le destinataire qu'il peut refuser l'acte à signifier s'il est rédigé dans une langue autre que la langue officielle de l'État membre requis et d'informer immédiatement l'entité d'origine que le destinataire refuse de recevoir l'acte conformément au § 1 de l'article 8 et ce au moyen de l'attestation visée à l'article 10, et en ce cas de retourner la demande ainsi que les pièces dont la traduction est demandée.

| | |
|---|---|
| FF | 114,92 |
| FF/5 | 45,96 |
| VACS | 10,36 |
| DINF | 11,41 |
| PC | 8,10 |
| ENR | 25,00 |
| TPL | 3,70 |
| FRL | 82,00 |
| TOT | 301,45 |

Et attendu qu'en vertu de l'article 14 du Règlement, chaque Etat membre a la faculté de procéder directement par la poste à la signification des actes judiciaires aux personnes résidant dans un autre Etat membre, j'ai, Huissier de Justice susdit et soussigné, conformément aux communications des Etats membres publiées au Journal officiel des Communautés européennes, envoyé à l'adresse du destinataire une copie de mon présent exploit, déposée ce jour sous pli recommandé avec avis de réception, contenant également un bordereau des pièces envoyées, au bureau de poste à Bruxelles.

Et j'ai annexé les récépissés des envois recommandés à l'original de mon présent exploit.

Dont acte. Coût : trois cent un euros et quarante-cinq cents,
à majorer éventuellement des frais de recommandé, soit       13,40       EUR.

L'Huissier de Justice,

*AVIS IMPORTANT :*
*L'organe légal qui représentera la partie citée devra être porteur lors de la comparution devant la juridiction saisie d'un extrait du Moniteur Belge d'où résulte son pouvoir de représentation.*

Droits d'enregistrement -- Application de l'article 8bis du C.enreg. -- Droit d'enregistrement : 25,00 EUR



Welcome to Alibaba.com, Join Free | Sign In

Buy    Sell    Community    My Alibaba    My Favorites    Help

Search all Buyers

QuotSyqayyhnder

Home > Buy > New Yorker S. H. K. Jeans Gmbh

Alibaba.com

**Free Member**          New Yorker S. H. K. Jeans Gmbh

Home        Products        TrustPass Profile        About Us        Contacts

Contact Information

search our products 🔍

Contact Person

Company Profile                                  Mr. Tim Huesoman

Trade Show                                           Offline

Company Info                                                                    Upload your photo to attract more business!

New Yorker S. H. K.        Company Name:       New Yorker S. H. K. Jeans Gmbh
Jeans Gmbh
[Germany][·]               Street Address:     Hansestrasse 48

City:                      City:               Braunschweig
Braunschweig

Country/Region :           Country/Region:     Germany
Germany

Business Type:             Zip:                38112
Distribution/Wholesaler
                           Telephone           49-531-2135819

                           Fax:                49-531-2135831

Online Postings:               Send your message to this supplier
Product(s)

Offline                    Enter your message here

Your Contact Details

Add Company to Favorites   Mr. Tim Huesoman
                           Offline             Enter a detailed description of your request, such as deliver y

                                                                    Send

                        Didn't find what you're looking for? Post a buying lead.

Spotlight Discover the hottest deals from suppliers worldwide                                          1  2

Mini MP4 Speaker    Bamboo T Shirt      Slimming Coffee    Coin Bank         Calculator

   US $30.0            US $2.0              US $5.0           US $2.0           US $1.0

Min Order: 500pcs    Min Order: 250pcs    Min Order: 10pcks   Min Order: 270pcs   Min Order: 1000pcs

Want your products here?                                                                    More

                Email this page        Bookmark this page        Print this page

                        Company Information · Site Map · Partnerships
            Buy · Sell · My Alibaba · Community · Trade Shows · Safety & Security · Help · Contact Us

Browse by:Manufacturers · Wholesalers · China Gold Suppliers · All Products · Countries · Importers · Buying Leads · China · UK · Australia
Alibaba Group: Alibaba.com: Alibaba China · Alibaba International · AliExpress · Alibaba Japan | Taobao | Alipay | Yahoo! China | Koubei.com | Ahsoft
            Product Listing Policy · Intellectual Property Policy and Infringement Claims · Privacy Policy · Terms of Use
            Copyright Notice © 1999-2010 Alibaba.com Hong Kong Limited and licensors. All rights reserved.
                            Join the Alibaba.com Research Panel

EXHIBIT C



**Jacques GIELEN**
**Marc VERMEULEN**
**Patrick GIELEN**
Huissiers de Justice

Avenue Molière, 266 - 1180 Uccle

**T** : 02/340.70.91 – **F** : 02/347.45.75
**M** : info@hostarii.eu
**ING** : BE12 6305 0023 2392
**BIC** : BBRUBEBB

Etude ouverte de 09.00 à 12.00
T.V.A. BE0543.659.264

O / T / R
Réf. Cli : LEVI STRAUSS / NEW YORKER
**Ref. Etude B0032485**

---

# CITATION

---

L'an deux mille quatorze, le **DIX- HUIT JUIN**

1. Ma requérante constata en 2014 que la citée distribuait, notamment en France et aux Pays-Bas, des pantalons sous la marque verbale 'Smog' portant le signe suivant, apposé sur leurs poches arrières:



2. Ce faisant, la citée agit en violation de la transaction conclue avec ma requérante le 21 juillet 2006, par laquelle la citée s'obliga à ne plus distribuer des pantalons portant des signes similaires à sa marque graphique appelée « arcuate » ou « ailes de mouette », enregistrée en tant que marque communautaire pour des vêtements sous le numéro 002285443 et représentée comme suit:



3. En effet, cette transaction donne de la notion de signe similaire une définition couvrant incontestablement le signe représenté *supra* sous le point 1, car précisant, d'une part, que doit de toute manière être considéré comme similaire tout dessin d'une surpiqûre

consistant en des lignes courbes se rejoignant au milieu du dessin d'une poche et pointant vers le bas et donnant, d'autre part, des exemples graphiques de signes à considérer comme similaires dont certains présentent plus de différences avec la marque « arcuate ».

4.  Il convient dès lors de condamner la citée au respect de la transaction en la condamnant à cesser de faire usage de ce signe litigieux.

5.  Cette transaction oblige par ailleurs la citée à payer à ma requérante une indemnité forfaitaire de 50 € par pantalon distribué en violation de l'obligation de ne pas distribuer des pantalons portant un signe similaire tel que défini par la transaction.

6.  Comme il est acquis que la citée, qui dispose de plus de 300 points de vente, a distribué à tout le moins 5.000 exemplaires de ces pantalons, la citée est redevable d'une indemnité provisionnelle de 250.000 €.

7.  Il convient, avant de se prononcer d'une manière définitive sur le dommage, de nommer un expert chargé de déterminer le nombre exact d'exemplaires distribués.

8.  En vertu de l'article 8 de la transaction, cette dernière est soumise au droit belge et tout litige y relatif est de la compétence exclusive des tribunaux de Bruxelles.

9.  Enfin, la cause n'appelle que des débats succincts, de sorte qu'il y a lieu, conformément à l'article 735 de Code judiciaire, de retenir l'affaire à l'audience d'introduction. En effet, par jugement du 20 octobre 2011 du Tribunal de commerce de Bruxelles, rendu entre les mêmes parties, il fut jugé:

    –  Que cette transaction est valable et lie la citée;

    –  Que la citée la viola en distribuant des pantalons portant un des signes suivants:

 

 

— Que l'indemnité forfaitaire de 50 € par pantalon distribué est due et que l'estimation d'une distribution d'au moins 5.000 exemplaires est juste;

— Qu'il convenait, avant dire droit sur l'indemnité définitive, de désigner comme expert Monsieur Benoît Coene avec la mission de déterminer le nombre exact de pantalons litigieux distribués.

10.  Dans ces conditions, la seule question à débattre est celle de savoir si le signe représenté *supra* sous le point 1 doit également être considéré comme un signe similaire au sens de la transaction. Or, il serait peu sérieux de prétendre qu'elle ne pourrait pas être entièrement tranchée lors de débats succincts, ce signe ne présentant pas plus de différences avec la marque "arcuate" que certains des quatre signes représentés *supra* sous le point 9 ou des sept signes suivants représentés dans la transaction comme exemples de signes à considérer comme similaires:



Que ma requérante demande en outre que le jugement à intervenir soit déclaré exécutoire par provision nonobstant tout recours et sans caution avec exclusion de la possibilité de cantonnement,

Attendu que ma requérante demande enfin, conformément à l'article 6.1 du Règlement (CE) n° 805/2004 du Parlement européen et du Conseil du 21 avril 2004 portant création d'un titre exécutoire européen pour les créances incontestées (publié le 30 avril 2004 au Journal officiel des Communautés européennes L 143) (site électronique du Règlement:

http://europa.eu.int/eur-lex/pri/fr/oj/dat/2004/l_143/l_14320040430fr00150039.pdf),

qui dispose qu'une décision relative à une créance incontestée rendue dans un Etat membre est, sur demande adressée à tout moment à la juridiction d'origine, certifiée en tant que titre exécutoire européen si les autres conditions posées par le Règlement sont remplies, de dire pour droit que le jugement à intervenir est certifié en tant que titre exécutoire européen et que le greffier en chef de la juridiction est tenu de délivrer, à la première demande de la partie demanderesse, le certificat de titre exécutoire européen au moyen du formulaire type figurant à l'annexe I dudit Règlement, conformément au prescrit de son article 9.1.

Attendu que l'article 19 du Règlement 805/2004 dispose:

"Normes minimales pour un réexamen dans des cas exceptionnels

1. Sans préjudice des articles 13 à 18, une décision ne peut être certifiée en tant que titre exécutoire européen que si le débiteur a le droit, en vertu de la loi de l'Etat membre d'origine, de demander un réexamen de la décision en question, lorsque les conditions suivantes sont remplies:

a)

i) l'acte introductif d'instance ou un acte équivalent ou, le cas échéant, la citation à comparaître a été signifié ou notifié par l'un des modes prévus à l'article 14, et

ii) la signification ou la notification n'est pas intervenue en temps utile pour lui permettre de préparer sa défense sans qu'il y ait eu faute de sa part;

ou

b) le débiteur a été empêché de contester la créance pour des raisons de force majeure ou par suite de circonstances extraordinaires, sans qu'il y ait eu faute de sa part,

à condition qu'il agisse rapidement dans les deux cas",

Attendu que le système belge satisfait non seulement à l'article 19.1.a) de ce Règlement, mais également à son article 19.1.b),

Attendu que pour ce qui concerne l'article 19.1.a) la législation belge organise les voies de recours ordinaires (appel et opposition) sans même distinguer entre les modes de signification ni imposer comme condition de recevabilité du recours l'absence de faute du débiteur,

Attendu que pour ce qui concerne l'article 19.1.b) le système juridique belge admet le relevé de forclusion en raison d'un cas de force majeure (qui ne peut résulter que d'un événement indépendant de la volonté humaine et qui n'est ni prévisible ni évitable (voy. G. de Leval, Eléments de procédure civile, 2ème édition, Bruxelles, Larcier, 2005, 285, n° 190 D, qui cite: Cass., 25 juin 1956, Pas., 1956, I, 1176 ; Cass., 9 octobre 1986, R.W., 1987-88, 778 ; Cass., 1er juin 1988, Pas., 1988, I, n° 605 ; Cass., 30 avril 2002, R.G., n° P. 001617.N ; Cass., 21 mai 2003, R.G., n° P. 03.0699.F)), ce qui, de surcroît, correspond à ce qui prévoit l'article 19.4. du Règlement 1348/2000 du Règlement (CE) n° 1348/2000 du Conseil de l'Union européenne du 29 mai 2000, relatif à la signification et à la notification dans les Etats membres des actes judiciaires et extrajudiciaires en matière civile et commerciale (publié le 30 juin 2000 au Journal officiel des Communautés européennes L 160), Règlement qui connaît une application directe dans le droit belge,

Attendu qu'il faut encore préciser que l'expression "circonstances extraordinaires" ne peut correspondre qu'à un cas de force majeure (BRIJS, S. et VAN DROOGHENBROECK, J.-F., « La pratique judiciaire au défi du titre exécutoire européen », in M. CANDELA SORIANO et G. DE LEVAL (Ed.), Espace judiciaire européen. Acquis et enjeux futurs en matière civile, Bruxelles, Larcier, 2007, 261, n° 55),

## SI EST-IL QUE

A la requête de ;

**La société de droit américain constituée selon les lois de l'Etat du Delaware LEVI STRAUSS & Co**, dont le siège est établi à San Francisco, Levi's Plaza, Battery Street, 1155, Californie, Etats-Unis d'Amérique,

représentée par Maîtres **Thierry van Innis**, avocat, ayant son cabinet à 1081 Bruxelles, rue De Neck, 22, boîte 38

Je soussigné **Marc VERMEULEN** Huissier de Justice, de résidence à 1180 Uccle, avenue Molière, 266;

**AI DONNE CITATION À**

**La société de droit allemand New Yorker S.H.K. Jeans GmbH**, dont le siège social est établi à 38112 Braunschweig (Allemagne), Hansestrasse 48 ;

Et pour que le destinataire n'en ignore, mais attendu qu'il réside sur le territoire de la République Fédérale d'Allemagne, État membre de l'Union européenne, et attendu qu'aucune résidence ou domicile élu du destinataire ne me sont connus en Belgique, j'ai, huissier de justice susdit et soussigné,

*en vertu de l'article 4 du Règlement (CE) N° 1393/2007 du Conseil de l'Union européenne du 13 novembre 2007, relatif à la signification et à la notification dans les États membres des actes judiciaires et extrajudiciaires en matière civile et commerciale, entré en vigueur le 30 décembre 2007.*

transmis, sous pli recommandé avec avis de réception, déposé ce jour au bureau de poste à Bruxelles,

A. deux copies du présent exploit (ainsi que les pièces y mentionnées), conformément à l'article 4 (5);
B. chaque copie (et les pièces y mentionnées) accompagnées d'une traduction en allemand;
C. le tout accompagné d'une demande de signification d'acte complété en allemand

À

**Amtsgericht Braunschweig**
An der Martinikirche 8
D-38100 Braunschweig
DEUTSCHLAND

avec prière:

1. d'adresser, à la réception de l'acte, par les moyens les plus rapides, un accusé de réception à l'entité d'origine, à savoir l'huissier de justice instrumentant soussigné, dans les meilleurs délais et en tout cas, dans les sept jours qui suivent cette réception en utilisant le formulaire type adéquat, conformément à l'article 6 (1) du Règlement;

2. de transmettre l'acte, pour la signification duquel elle n'est pas territorialement compétente, ainsi que la demande, à l'entité requise territorialement compétente du même État membre, qui, elle, en informera l'entité d'origine au moyen du formulaire type, conformément à l'article 6 (4);

3. de procéder ou de faire procéder à la signification de l'acte dans les meilleurs délais et s'il n'a pas été possible de procéder à la signification dans le délai d'un mois, d'en informer l'entité d'origine, en application de l'article 7 (2), au moyen du certificat prévu à l'article 10;

4. lorsque les formalités relatives à la signification auront été accomplies, d'établir une attestation au moyen du formulaire type et de l'adresser à l'entité d'origine, avec une copie de l'acte signifié, conformément aux dispositions de l'article 10;

5. d'aviser le destinataire qu'il peut refuser l'acte à signifier s'il est rédigé dans une langue autre que la langue officielle de l'État membre requis et d'informer immédiatement l'entité d'origine que le destinataire refuse de recevoir l'acte conformément au § 1 de l'article 8 et ce au moyen de

l'attestation visée à l'article 10, et en ce cas de retourner la demande ainsi que les pièces dont la traduction est demandée.

Et attendu qu'en vertu de l'article 14 du Règlement, chaque État membre a la faculté de procéder directement par la poste à la signification des actes judiciaires aux personnes résidant dans un autre État membre, j'ai, huissier de justice susdit et soussigné, conformément aux communications des États membres publiées au Journal officiel des Communautés européennes, envoyé à l'adresse du destinataire une copie de mon présent exploit (avec les pièces y mentionnées), accompagnée d'une traduction en allemand, déposé ce jour sous pli recommandé avec avis de réception au bureau de poste à Bruxelles .

Et j'ai annexé les récépissés des envois recommandés à l'original de mon présent exploit.

> A comparaître le **jeudi dix-sept juillet deux mille quatorze à neuf heures,** à l'audience de vacation du **Tribunal de Commerce francophone de Bruxelles,** siégeant au local ordinaire de ses audiences sis, Salle A, boulevard de Waterloo, 70, audit 1000 Bruxelles;

**AUX FINS DE**

- entendre retenir l'affaire à l'audience d'introduction;

- entendre déclarer la demande recevable et fondée;

- ordonner à la citée de cesser d'offrir en vente ou de distribuer des pantalons portant le signe incriminé, sous peine d'une astreinte de 1 000 euros par pantalon offert en vente ou distribué en violation cet ordre ;

- condamner la citée au paiement à la requérante d'une somme provisionnelle de 250.000 euros ;

- avant dire droit de manière définitive sur la demande en réparation du dommage de ma requérante, désigner Monsieur Benoît Coene comme un expert ayant pour mission de déterminer le nombre de pantalons litigieux offerts en vente ou distribués en violation de ladite transaction ;

- condamner la citée à tous les dépens, en ce compris l'indemnité de procédure.

-

- Dès lors conformément à l'article 6.1. du Règlement (CE) n° 805/2004 entendre certifier le jugement à intervenir en tant que titre exécutoire européen, et entendre dire pour droit que le greffier en chef de la juridiction est tenu de délivrer, à la première demande de la partie demanderesse, le certificat de titre exécutoire européen au moyen du formulaire type figurant à l'annexe I dudit Règlement, conformément au prescrit de son article 9.1.

- En outre, conformément à l'article 17 dudit Règlement, j'ai communiqué à la partie citée:

-

- \* qu'elle peut contester la demande en comparaissant physiquement en Belgique jeudi dix-sept juillet deux mille quatorze à neuf heures, à l'audience de vacation du Tribunal de Commerce francophone de Bruxelles, siégeant au local ordinaire de ses audiences sis, Salle A, boulevard de Waterloo, 70, audit 1000 Bruxelle, et qu'elle peut comparaître physiquement devant le tribunal d'une des manières suivantes :

- - par son organe (qui doit fournir la preuve de sa qualité) si le destinataire de l'acte est une société et en personne si le destinataire est une personne physique. Dans le cas où l'affaire est introduite devant le juge de paix, le tribunal de commerce ou les juridictions de travails par son conjoint ou par un parent allié porteur d'une procuration écrite et agrée spécialement par la juridiction ;

- - par un avocat (ce qui n'est toutefois pas obligatoire),

-
- \* qu'un avocat (donc non l'organe de la partie citée si le destinataire est une société ou la partie citée si le destinataire est une personne physique) peut également comparaître par écrit, sauf si la juridiction décidait de retenir la cause à l'audience d'introduction, ce qui d'ailleurs est expressément demandé par la partie requérante,

-
- \* que, si la partie citée ne comparaît pas, la juridiction belge peut tout de même prononcer un jugement, condamnant la partie citée aux sommes et intérêts demandés dans la présente citation, y compris les frais de l'instance (un pareil jugement s'appelle un jugement par défaut), jugement qui peut être déclaré exécutoire par provision par la juridiction, ce qui signifie que le jugement peut être exécuté contre la partie citée, même si celle-ci décidait d'initier un recours contre la décision en question.

Demande fondée sur la convention des parties, les motifs figurant aux attendus qui précèdent, les lois et règles de la matière, ainsi que sur tous autres moyens de droit et/ou de fait à faire valoir en temps et lieu et ici expressément réservés, sous toutes réserves généralement quelconques et sans la moindre reconnaissance préjudiciable, dénégation de tous faits non expressément reconnus et contestation de leur pertinence.

Et pour que la (les) partie(s) signifiée(s) n'en ignore(ent) je lui (leur) ai laissé, étant et parlant comme dit ci-dessus, copie du présent exploit, sous pli fermé s'il échet, conformément à la loi;

DONT ACTE,

| | |
|---|---|
| FF     : 126,71 | Coût : six cent quatre-vingt-cinq Euros zero six Cents , à augmenter éventuellement du coût de l'envoi recommandé, s'il échet, mise au rôle comprise ; |
| DCOP  :  50,68 | |
| FTR    : 212,80 | |
| PORT  :  28,60 | |
| PC     :   8,93 | |
| VACS  :  11,42 | |
| ------------ | |
| DR      : 439,14 | Droits d'enregistrement - Application de l'article 8bis du C.Enreg.        - Droits d'enregistrement : 50,00 € |
| TVA    :  92,22 | |
| | |
| ENR    :  50,00 | |
| TPL    :   3,70 | |
| FRL    : 100,00 | |
| ------------ | |
| NS     : 153,70 | |
| ------------ | |
| Total: 685,06 | |

ALM
B0032485
200377

**Jacques GIELEN**
**Marc VERMEULEN**
**Patrick GIELEN**
Gerichtsvollzieher



Avenue Molière, 266 - 1180 Uccle

T: +32 (0)2 340 70 91 – F: +32 (0)2 347 45 75
M: info@hostarii.eu
ING: BE12 6305 0023 2392
BIC: BBRUBEBB

Amtsstube geöffnet von 09.00 bis 12.00
MwSt. BE0543.659.264

O / T / R

Aktenzeichen RA: LEVI STRAUSS / NEW YORKER
Aktenzeichen Amtsstube B0032485

---

## L A D U N G

---

Das Jahr zweitausendvierzehn, am  *18. Juni*

1. Meine Antragstellerin stellte 2014 fest, dass die geladene Partei insbesondere in Frankreich und in den Niederlanden Hosen unter der Wortmarke ‚Smog' vertrieb, die das folgende Zeichen auf den Gesäßtaschen trugen:



2. Hierdurch verstößt die geladene Partei gegen die mit meiner Antragstellerin am 21. Juli 2006 geschlossene Vereinbarung, durch die die geladene Partei sich verpflichtete, keine Hosen mehr zu vertreiben, die ähnliche Zeichen wie das Zeichen „arcuate" oder „Möwenflügel" meiner Antragstellerin tragen, welches als Gemeinschaftsmarke für Kleidungsstücke unter Nummer 002285443 eingetragen und wie folgt dargestellt ist:



3. In der Tat steht in dieser Vereinbarung eine Definition des Begriffs des ähnlichen Zeichens, welche zweifellos das weiter oben in Punt 1 gezeigte Zeichen abdeckt, da in dieser Definition zum einen dargelegt wird, dass jedes Dessin einer Ziernaht,

die aus gekrümmten Linien besteht, welche in der Mitte des Dessins einer Tasche zusammentreffen und nach unten gerichtet sind, als ähnlich anzusehen ist, und da in dieser Definition zum anderen grafische Beispiele für Zeichen gegeben werden, die als ähnlich anzusehen sind, wovon einige größere Unterschiede zu der Marke "arcuate" aufweisen.

4.  Es ist daher angebracht, die geladene Partei zur Beachtung der Vereinbarung zu verurteilen und ihr die weitere Nutzung des strittigen Zeichens zu untersagen.

5.  Durch diese Vereinbarung wird die geladene Partei außerdem dazu verpflichtet, meiner Antragstellerin eine pauschale Entschädigung von 50 € je Hose zu zahlen, welche in Zuwiderhandlung gegen die Verpflichtung, keine Hosen zu vertreiben, die ein ähnliches Zeichen gemäß der Definition in der Vereinbarung tragen, vertrieben wird.

6.  Da als gesichert gilt, dass die geladene Partei, die über mehr als 300 Verkaufsstellen verfügt, zumindest 5.000 Exemplare dieser Hosen verkauft hat, schuldet die geladene Partei eine Entschädigung von vorläufig 250.000 €.

7.  Es ist angebracht, einen Gutachter zu bestellen, der mit der Feststellung der exakten Anzahl der vertriebenen Exemplare beauftragt wird, bevor endgültig über den Schaden geurteilt wird.

8.  Gemäß Artikel 8 der Vereinbarung unterliegt diese dem belgischen Recht und sind ausschließlich die Gerichte von Brüssel für jeden Streitfall betreffend die Vereinbarung zuständig.

9.  Schließlich bedarf die Angelegenheit nur einer kurzen Verhandlung, so dass es gemäß Artikel 735 des belgischen Gerichtsgesetzbuches angebracht ist, die Angelegenheit auf der verfahrenseinleitenden Sitzung zu verhandeln. In der Tat hat das Urteil des Handelsgerichts von Brüssel vom 20. Oktober 2011 in Bezug auf dieselben Parteien festgestellt:

    – dass diese Vereinbarung gültig und für die geladene Partei verbindlich ist;

    – dass die geladene Partei gegen die Vereinbarung verstieß, indem sie Hosen mit einem der folgenden Zeichen vertrieb:

 

 

- dass die pauschale Entschädigung von 50 € je verkaufter Hose geschuldet wird und dass die Schätzung eines Vertriebs von mindestens 5.000 Exemplaren richtig ist.

- dass es angebracht war, Herrn Benoît Coene als Gutachter zu bestellen, der mit der Feststellung der exakten Anzahl der vertriebenen strittigen Exemplare beauftragt war, bevor endgültig über die Entschädigung geurteilt wurde.

10.  Unter diesen Bedingungen stellt sich lediglich die Frage, ob das weiter oben in Punkt 1 dargestellte Zeichen ebenfalls als ein ähnliches Zeichen im Sinne der Vereinbarung angesehen werden muss. Nun kann aber nicht ernsthaft behauptet werden, dass diese Frage nicht vollständig im Rahmen einer kurzen Verhandlung geklärt werden könnte, da dieses Zeichen keine größeren Unterschiede zu der Marke „arcuate" aufweist als einige der weiter oben in Punkt 9 dargestellten vier Zeichen oder der nachstehenden sieben Zeichen, die in der Vereinbarung als Beispiele für Zeichen, die als ähnlich anzusehen sind, abgebildet sind:



Dass meine Antragstellerin zudem fordert, dass das zu fällende Urteil für vorläufig vollstreckbar erklärt wird, unbeschadet aller Rechtsmittel und ohne Sicherheitsleistung mit Ausschluss der Möglichkeit einer Hinterlegung der Beträge („cantonnement").

In Anbetracht, dass meine Antragstellerin schließlich fordert, für Recht zu sprechen, dass das zu erlassende Urteil als Europäischer Vollstreckungstitel bestätigt wird, gemäß Artikel 6.1 der Verordnung (EG) Nr. 805/2004 des Europäischen Parlaments und des Rates der Europäischen Union vom 21. April 2004 zur Einführung eines Europäischen Vollstreckungstitels für unbestrittene Forderungen (veröffentlicht am 30. April 2004 im Amtsblatt der Europäischen Union L 143) (elektronischer Standort der Verordnung: http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2004:143:0015:0039:DE:PDF),

der besagt, dass eine in einem Mitgliedstaat über eine unbestrittene Forderung ergangene Entscheidung auf jederzeitigen Antrag an das Ursprungsgericht als Europäischer Vollstreckungstitel bestätigt wird, wenn die Entscheidung im Ursprungsmitgliedstaat vollstreckbar ist, unter der Voraussetzung dass andere, in der Verordnung gesetzte Bedingungen erfüllt sind, und dass auf ersten Antrag der Antragstellerin der Haupturkundsbeamte der Gerichtsbarkeit den Nachweis der Bescheinigung als Europäischer Vollstreckungstitel gemäß Artikel 9.1. der Verordnung in Form des in Anhang I der Verordnung aufgenommenen Standardformulars erteilen muss.

Da Artikel 19 der Verordnung 805/2004 festlegt:

"Mindestvorschriften für eine Überprüfung in Ausnahmefällen

1. Eine Entscheidung gemäß den Artikeln 13 bis 18 kann nur dann als Europäischer Vollstreckungstitel bestätigt werden, wenn der Schuldner nach dem Recht des Ursprungsmitgliedstaates berechtigt ist, eine Überprüfung der Entscheidung zu beantragen, falls folgende Voraussetzungen vorliegen:

a)

i) Die Zustellung oder Bekanntgabe des Schriftstücks, welches das Verfahren einleitet oder ein gleichwertiges Schriftstück oder gegebenenfalls die Ladung oder Einberufung zu einer Gerichtsverhandlung ist auf eine der in Artikel 14 genannten Arten erfolgt,

und

ii) Die Zustellung oder Bekanntgabe ist ohne Verschulden des Schuldners nicht so rechtzeitig erfolgt, dass er Vorkehrungen für seine Verteidigung hätte treffen können,

oder

b) der Schuldner konnte aufgrund höherer Gewalt oder aufgrund außergewöhnlicher Umstände ohne eigenes Verschulden der Forderung nicht widersprechen, unter der Voraussetzung, dass der Betroffene in beiden Fällen unverzüglich tätig wird",

Da das belgische Rechtssystem nicht nur Artikel 19.1.a) entspricht, sondern auch Artikel 19.1.b) der Verordnung.

Da im Hinblick auf Artikel 19.1.a) die belgische Gesetzgebung gewöhnliche Rechtsmittel (Berufung und Einspruch) vorsieht, die stets angewendet werden können, abgesehen von der Art und Weise, in der die Zustellung erfolgte und abgesehen von der Antwort auf die Frage, ob der Schuldner ein Verschulden trägt oder nicht.

Da im Hinblick auf Artikel 19.1.b) das belgische Rechtssystem festlegt, dass die Fristen, die zur Anwendung eines Rechtsmittels unter Androhung der Ungültigkeit vorgeschrieben sind, im Fall von höherer Gewalt (die allerdings nur unter Umständen außerhalb des menschlichen Willens vorliegen, und die weder vorhersehbar noch vermeidbar sind (siehe G. de Leval, Eléments de procédure civile, 2. Ausgabe, Brüssel, Larcier, 2005, S. 285, Nr. 190 D, der zitiert: Kass., 25. Juni 1956, Pas., 1956, I, S. 1176 ; Kass., 9. Oktober 1986, R.W., 1987-88, S. 778 ; Kass., 1. Juni 1988, Pas., 1988, I, Nr. 605 ; Kass., 30. April 2002, A.L., Nr. P.001617.N ; Kass., 21. Mai 2003, A.L., Nr. P. 03.0699.F)) ungültig sind, wobei dieser Artikel darüber hinaus mit der Bestimmung von Artikel 19.4 der Verordnung (EG) Nr. 1348/2000 vom Rat der Europäischen Union vom 29. Mai 2000 über die Zustellung und Bekanntgabe gerichtlicher und außergerichtlicher Schriftstücke in Zivil- oder Handelssachen (veröffentlicht am 30. Juni 2000 im Amtsblatt der Europäischen Union, L 160) übereinstimmt, wobei sich diese Verordnung direkt im belgischen Recht auswirkt.

Dass unter dem Ausdruck „außergewöhnliche Umstände" nur höhere Gewalt gemeint werden kann (siehe BRIJS S. und VAN DROOGHENBROECK J.-F., „La pratique judiciaire au défi du titre exécutoire européen", in M. CANDELA SORIANO et G. DE LEVAL (Ed.), Espace judiciaire européen. Acquis et enjeux futurs en matière civile, Brüssel, Larcier, 2007, 261, Nr. 55).


**DAHER**


Auf Antrag von:

**LEVI STRAUSS & Co, Gesellschaft nach amerikanischem Recht, gegründet gemäß den Gesetzen des Bundesstaates Delaware**, mit Sitz in den Vereinigten Staaten von Amerika, in San Francisco, Kalifornien, 1155 Battery Street, Levi's Plaza,

Mit dem Rechtsbeistand von RA **Thierry van Innis**, Rechtsanwalt mit Kanzlei in 1081 Brüssel, rue De Neck 22, Bfk 38

Habe ich, der Unterzeichnete, **Marc VERMEULEN,** Gerichtsvollzieher mit Amtssitz in 1180 Uccle, avenue Molière 266;

**LADUNG ERTEILT AN:**

**New Yorker S.H.K. Jeans GmbH, Gesellschaft nach deutschem Recht,** mit Sitz in Deutschland, in 38112 Braunschweig, Hansestraße 48;

Und damit die Empfängerpartei darüber in Kenntnis gesetzt wird, jedoch in Anbetracht dessen, dass sie ihren Wohnsitz am Grundgebiet der Bundesrepublik Deutschland, Mitgliedstaat der Europäischen Union, hat und mir von ihr weder ein Aufenthaltsort noch ein gewählter Wohnsitz in Belgien bekannt sind, so habe ich, unterzeichneter und besagter Gerichtsvollzieher,

*in Anwendung von Artikel 4 der Verordnung (EG) Nr. 1393/2007 des Rates der Europäischen Union vom 13. November 2007 über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke in Zivil- oder Handelssachen in den Mitgliedstaaten, in Kraft getreten am 30. Dezember 2007,*

übermittelt, in eingeschriebenem Umschlag mit Rückschein, heute beim Postamt von Brüssel aufgegeben,

A.     Zwei Abschriften der vorliegenden Gerichtsvollzieherurkunde (sowie der darin erwähnten Schriftstücke), gemäß Artikel 4 (5);
B.     Jede Abschrift (und die darin erwähnten Schriftstücke) mit einer Übersetzung ins Deutsche versehen;
C.     Dies alles gemeinsam mit einem Antrag auf Zustellung des Schriftstücks, ausgefüllt in deutscher Sprache;

an das

## Amtsgericht Braunschweig
An der Martinikirche 8
D-38100 Braunschweig
DEUTSCHLAND

Mit der Bitte

1.     Nach Erhalt des Schriftstücks, auf schnellstmöglichem Wege, eine Empfangsbestätigung, übereinstimmend mit dem adäquaten Formblatt, gemäß Artikel 6 (1) der Verordnung, an die Übermittlungsstelle, d.h. den unterzeichneten zuständigen Gerichtsvollzieher, zu übermitteln, und dies so bald wie möglich, auf jeden Fall aber innerhalb von sieben Tagen nach Erhalt;

2.     Das Schriftstück, für dessen Zustellung die Empfangsstelle örtlich nicht zuständig ist, mit dem Zustellungsantrag an die örtlich zuständige Empfangsstelle in demselben Mitgliedstaat weiterzuleiten, und die Übermittlungsstelle unter Verwendung des adäquaten Formblattes, gemäß Artikel 6 (4), davon in Kenntnis zu setzen;

3.     Die Zustellung des Schriftstücks so bald wie möglich zu bewirken oder zu veranlassen. Falls die Zustellung nicht innerhalb eines Monates nach dem Eingang des Schriftstücks vorgenommen werden konnte, dies unter Anwendung von Artikel 7 (2) der Übermittlungsstelle unter Verwendung der in Artikel 10 vorgesehenen Bescheinigung mitzuteilen;

4.     Wenn die Formalitäten im Hinblick auf die Zustellung des Schriftstücks erledigt wurden, eine Bescheinigung mittels des Formblattes auszustellen, und dies der Übermittlungsstelle zu übersenden, mit einer Abschrift des zugestellten Schriftstücks, gemäß den Bestimmungen von Artikel 10;

5.    Die Empfängerpartei davon in Kenntnis zu setzen, dass sie die Annahme des zuzustellenden Schriftstücks verweigern darf, wenn dieses in einer anderen als der offiziellen Sprache des beantragten Mitgliedstaates erstellt ist, und die Übermittlungsstelle über die Verweigerung der Empfängerpartei gemäß Artikel 8 Absatz 1, das Schriftstück in Empfang zu nehmen, unverzüglich unter Verwendung der in Artikel 10 erwähnten Bescheinigung in Kenntnis zu setzen und in diesem Fall den Antrag sowie die Schriftstücke, um deren Übersetzung ersucht wird, zurückzusenden.

Und in Anbetracht der Tatsache, dass gemäß Artikel 14 der Verordnung es jedem Mitgliedstaat frei steht, Personen, die ihren Wohnsitz in einem anderen Mitgliedstaat haben, gerichtliche Schriftstücke unmittelbar durch die Post zustellen zu lassen, so habe ich, unterzeichneter und besagter Gerichtsvollzieher, gemäß den Mitteilungen der Mitgliedstaaten, veröffentlicht im Amtsblatt der Europäischen Union, eine Abschrift der vorliegenden Gerichtsvollzieherurkunde (sowie der darin erwähnten Schriftstücke), samt einer Übersetzung ins Deutsche, heute in eingeschriebenem Umschlag mit Rückschein beim Postamt von Brüssel aufgegeben, an die Adresse der Empfängerpartei übermittelt.

Und die Empfangsbestätigungen der eingeschriebenen Sendungen habe ich dem Original der vorliegenden Gerichtsvollzieherurkunde beigefügt.

> Zu erscheinen am **Donnerstag, dem siebzehnten Juli zweitausendvierzehn um neun Uhr,** in der Feriensitzung **des französischsprachigen Handelsgerichts von Brüssel,** tagend im üblichen Verhandlungssaal, Gerichtssaal A, boulevard de Waterloo 70, im besagten 1000 Brüssel;

**UM**

-    Zu hören, dass die Angelegenheit auf der verfahrenseinleitenden Sitzung verhandelt wird;

-    Zu hören, dass die Klage zulässig und begründet erklärt wird;

-    Zu hören, dass der geladenen Partei angeordnet wird, keine Hosen, die das beanstandete Zeichen tragen, mehr zum Verkauf anzubieten oder zu vertreiben, und dies unter Androhung eines Zwangsgeldes von 1.000,00 Euro je Hose, die in Zuwiderhandlung gegen diese Anordnung zum Verkauf angeboten oder vertrieben wird;

-    Zu hören, dass die geladene Partei dazu verurteilt wird, der Antragstellerin eine Summe von vorläufig 250.000,00 Euro zu zahlen;

-    Zu hören, dass vor der endgültigen Rechtsfindung betreffend den Antrag auf Entschädigung des Schadens meiner Antragstellerin Herr Benoît Coene als Gutachter bestellt wird mit dem Auftrag, die Anzahl der zum Verkauf angebotenen oder vertriebenen strittigen Hosen festzustellen;

-    Zu hören, dass die geladene Partei in sämtliche Kosten verwiesen wird, einschließlich der Verfahrensentschädigung.

-    Und demzufolge gemäß Artikel 6.1 der oben genannten Verordnung (EG) Nr. 805/2004 das zu erlassende Urteil als Europäischen Vollstreckungstitel zu bestätigen und für Recht zu sprechen, dass auf ersten Antrag der antragstellenden Partei die Haupturkundsbeamte der Gerichtsbarkeit den Nachweis der Bestätigung als Europäischer Vollstreckungstitel gemäß Artikel 9.1 der

EXHIBIT C

Verordnung in Form des in Anhang I der Verordnung aufgenommenen Standardformulars erteilen muss.

Gleichzeitig habe ich der geladenen Partei gemäß Artikel 17 der oben genannten Verordnung mitgeteilt:

* dass sie die Forderung durch physisches Erscheinen in Belgien am Donnerstag, dem siebzehnten Juli zweitausendvierzehn um neun Uhr in der Feriensitzung des französischsprachigen Handelsgerichts von Brüssel, tagend im üblichen Verhandlungssaal, Gerichtssaal A, boulevard de Waterloo 70 im besagten 1000 Brüssel bestreiten kann, und dass sie vor dem Richter auf eine der folgenden Arten physisch erscheinen kann:

o durch ihr Organ (das seine Eigenschaft jedoch nachweisen muss), wenn die Empfängerpartei der Urkunde eine Gesellschaft ist, und persönlich, wenn die Empfängerpartei eine natürliche Person ist. Wenn die Forderung vor dem Friedensrichter, dem Handelsgericht oder den Arbeitsgerichten eingeleitet wird, durch seinen Ehepartner oder verwandten Inhaber einer schriftlichen Vollmacht, und speziell vom Richter zugelassen,

o durch einen Rechtsanwalt (die Vertretung durch einen Rechtsanwalt ist jedoch nicht verpflichtet),

* dass ein Rechtsanwalt (somit *nicht* das Organ der geladenen Partei, wenn die Empfängerpartei eine Gesellschaft ist, oder die geladene Partei, wenn die Empfängerpartei eine natürliche Person ist) auch schriftlich erscheinen kann, außer wenn der Richter entscheidet, dass die Streitsache bei der einleitenden Verhandlung behandelt wird, was von der antragstellenden Partei übrigens ausdrücklich beantragt wird.

* dass – wenn die geladene Partei nicht erscheint – das belgische Gericht doch ein Urteil aussprechen kann, in dem die geladene Partei zu den in dieser Ladung geforderten Summen und Zinsen verurteilt werden kann, einschließlich der Verfahrenskosten (ein derartiges Urteil wird als Versäumnisurteil bezeichnet), wobei dieses Urteil vom Richter für vorläufig vollstreckbar erklärt werden kann, d.h. dass es gegen die geladene Partei vollstreckt werden kann, auch wenn diese ein Rechtsmittel gegen dieses Urteil einlegt.

Die Klage stützt sich auf die Vereinbarung der Parteien, die in den obenstehenden Erwägungen angeführten Gründe, die diesbezüglichen Gesetze und Vorschriften sowie auf alle anderen rechtlichen und/oder faktischen Mittel, die gegebenenfalls geltend gemacht werden und hier ausdrücklich vorbehalten bleiben, unter sämtlichen Vorbehalten gleich welcher Art und ohne irgendeine nachteilige Anerkennung, unter Abstreitung aller nicht ausdrücklich anerkannten Sachverhalte und unter Anfechtung ihrer Sachdienlichkeit.

Und auf dass die zugestellte(n) Partei(en) dies zur Kenntnis nehme(n), habe ich ihr (ihnen), anwesend und sprechend wie weiter oben dargelegt, eine Abschrift der vorliegenden Gerichtsvollzieherurkunde, gegebenenfalls in verschlossenem Umschlag, gemäß dem Gesetz hinterlassen.

WORÜBER URKUNDE;

Kosten: 685,06 EUR